IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KARLIS WRIGHT,                    )
                                  )
         Plaintiff,               )
                                  )
    v.                            )        CIVIL ACTION NO. 2:08CV61-SRW
                                  )                   (WO)
HYUNDAI MOTOR MANUFACTURING )
ALABAMA, LLC,                     )
                                  )
         Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Karlis Wright brings this action against defendant Hyundai Motor

Manufacturing Alabama, LLC ("HMMA"), alleging that defendant discriminated against him

on the basis of his race (African-American) in violation of 42 U.S.C. § 1981, when it failed

to select him for one of three available "Team Leader" positions in February or March 2006.

(Id., ¶ 3, 15-17).[1]  This action is presently before the court on defendant's motion for

summary judgment (Doc. # 18).  Upon consideration of the motion, the court concludes that

---

[1]  In its motion, HMMA argues that any claim based on plaintiff's applications for other positions is barred because plaintiff did not allege it in his complaint and, also, that plaintiff cannot establish a *prima facie* case of discrimination as to the other positions about which he testified in his deposition.  (HMMA's brief, pp. 24-27).  In his response to the present motion, plaintiff does not respond to HMMA's argument regarding any other claims; he agrees that his claim is based on his non-selection for a "Team Leader" position.  (See Wright's brief, p. 1 (plaintiff filed his complaint "asserting that HMMA discriminated against him on the basis of his race, African-American, in violation of 42 U.S.C. § 1981.  More specifically, Plaintiff alleges that, because of his race, he was not promoted from the position of "Team Member" to "Team Leader.");  Wright depo., pp. 148-49 (testifying that his only claim is as to the team leader position "[u]nless I can work in the medical [claim] somewhere" and admitting that "the medical" is not in his complaint).  Plaintiff has not amended his complaint and, accordingly, the sole claim before the court pertains to plaintiff's non-selection for a "Team Leader" position.

it is due to be granted.

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact.  Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).  In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  Matsushita Electrical Industrial

Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment."  Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## MOTION TO STRIKE

Defendant moves to strike the declarations of Tammy Edwards and Jeffery Thomas (Plaintiff's Exhibits 20 and 21), pursuant to Rule 37(c), because plaintiff did not identify them as potential witnesses. (Motion to Strike, pp. 1-6).[2]  Rule 37(c) provides, in part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26(a) sets forth the requirement for initial disclosures, and Rule 26(e) pertains to a party's duty to supplement incomplete or incorrect disclosures or discovery

---

[2]  The court will address the motion to strike portions of plaintiff's declaration, to the extent necessary, in its discussion of pretext.

responses.  It is apparent, both from the rule and from the committee notes, that the drafters of the Federal Rules intended that courts take a party's failure to comply with an initial disclosure or supplementation obligation seriously.[3]

*Did Plaintiff Fail to Identify Witnesses as required by Rule 26(a) or (e)?*

Plaintiff does not claim that his initial disclosures or his responses to interrogatories are sufficient to advise defendant that Edwards or Thomas were potential witnesses,[4] nor does he argue that he supplemented his disclosures in writing at any time before his response to summary judgment.  Rather, plaintiff argues that he did comply with his disclosure obligation because he "briefly discussed both Edwards and Thomas during [his] deposition" and disclosed their identities as witnesses by filing their affidavits with his opposition to the summary judgment motion.  (Wright's response to motion to strike, pp. 1-2).  His apparent contention is that this disclosure was timely because the discovery period had not yet expired.  (Wright's response to motion to strike, pp. 2-3).  Plaintiff argues:

---

[3]  The Advisory Committee Notes for the 1993 revision of Rule 37(c) state:

The revision provides a self-executing sanction for failure to make a disclosure required by rule 26(a), without the need for a motion under subdivision (a)(2)(A).

Paragraph (1) prevents a party from using as evidence any witnesses or information that, without substantial justification, has not been disclosed as required by Rules 26(a) and 26(e)(1).  This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56.

Advisory Committee Notes, Rule 37(c)(1993 Amendments).

[4]  The court concludes that they were not sufficient.  See Exhibit B (plaintiff's October 7, 2008 response to interrogatory No. 4) and Exhibit D (plaintiff's September 10, 2008 initial disclosures).

> Rule 26(e)(1) states that '[a] party is under a duty to supplement *at appropriate intervals* its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is *incomplete* or incorrect and if the additional or corrected information *has not otherwise been made known to the other parties during the discovery process or in writing*.' Clearly, because the undersigned has not been involved in this cause for several months because of his departure as an associate from his former firm[,] supplementation under Rule 26(e)(1) is appropriate at the present time if, and only if, Plaintiff learns that some information disclosed is incomplete or 'has not otherwise been made known to the other parties during the discovery process or in writing.' Plaintiff contends that, because the identities or both Edwards and Thomas were disclosed during either Plaintiff's deposition or his Response in Opposition to Defendant's Motion for Summary Judgement, Defendant was aware that Both [sic] Edwards and Thomas were witnesses in this matter.

(Wright's response to motion to strike, pp. 4-5)(emphasis in original).  However, the question before the court is not, as framed by plaintiff's counsel, whether "supplementation . . . is appropriate at the present time."  Rather, since defendants seek to preclude the use of testimony from Edwards and Thomas on the present motion, the issue is whether plaintiff had an obligation to disclose their identities as witnesses at an earlier point in this litigation. Under Rule 26(e), a party must supplement or correct its earlier disclosure or discovery response "in a timely manner"[5] if: (1) a party learns that a previous disclosure or discovery response is incomplete or incorrect *and* (2) "the information *has not otherwise been made known* to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A)(emphasis added).

Plaintiff's argument that he disclosed Edwards' and Thomas' identities sufficiently in his deposition testimony is without merit. While plaintiff mentioned both Edwards and

---

[5] The rule has not, during the pendency of this case, included the "at appropriate intervals" language quoted and emphasized by plaintiff's counsel.

Thomas, his testimony did not suggest even remotely that he intended to or might offer

testimony from either of these individuals. (See Wright depo., pp. 115-18 and 124-25).[6]

---

[6] The question is closer as to Thomas.  Plaintiff testified that he believed that his write-up in October 2006 – plaintiff received a "Serious Misconduct" letter for engaging in horseplay after he allegedly put a toy snake on the plant floor – "had a bearing on the team leader selection" which occurred several months earlier, in March 2006.  (Wright depo., pp. 124-127 and Exhibits 16 and 17 to Wright depo.).  Plaintiff denied bringing the snake to the plant. His testimony regarding Thomas was as follows:

> Q.  Tell me what happened.
>
> A.  I don't know exactly what happened, except I was there and I was laughing at it, laughing at the situation.  And I apologized for laughing at the guy.
>
> Q.  What was the situation?
>
> A.  I just took off and starting running.  And we were looking around to find out what's going on.  And then he looked around and asked him what's going on, and he said, Man, y'all need to stop playing with me.
>
> Q.  Who is this you're referring to?
>
> A.  I think his name is Jeff.
>
> Q.  Was there a snake on the floor?
>
> A.  Yeah.  I saw one there once it was pointed out, yeah.
>
> Q.  But you deny having brought it to the plant?
>
> A.  I did not bring it there, nor did anybody ask me if I brought it there, nor did anybody investigate with me.

(Wright depo., pp. 124-26).  Plaintiff gave no additional testimony about "Jeff" and there is nothing in plaintiff's testimony to suggest – as Thomas now testifies in his declaration – that, even though Thomas did not know who placed the snake on the floor, Culpepper told Thomas to write in an incident report that plaintiff had done it.  The court concludes that plaintiff's testimony is not sufficient to identify Thomas as "an individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses[,]" (see Fed. R. Civ. P. 26(a)(1)(A)(i)) nor does it "set forth those facts of which the person has knowledge" as requested in defendant's interrogatory number 4 (see Exhibit B to Motion to

Thus, plaintiff has satisfied his disclosure obligation under Rule 26 as to these two witnesses only if submitting their declarations in opposition to summary judgment in August 2009 constitutes supplementation or correction "in a timely manner."

Plaintiff makes much of the fact that, when he disclosed these witnesses by filing their affidavits with his response to summary judgment, the discovery deadline had been extended until September 10, 2009.  However, the court does not read Rule 26(e) to mean that, if the information is otherwise made known to the other parties *at any time* during the discovery process, the duty to supplement in a timely matter is satisfied.  The rule requires instead that if a party (or his attorney)[7] learns that previous disclosures or discovery responses are incorrect or incomplete in a material respect, and the correct or additional information has not *at that time* otherwise been made known to the other parties, the party *then* has an existing obligation to supplement in a timely manner.  Accordingly, the timeliness of the supplementation depends on the time at which plaintiff or one or the other of his attorneys learned that the initial disclosures or responses to discovery were not correct as to witnesses.[8]

---

Strike).

[7]  The  duty to supplement "applies whether the corrective information is learned by the client or by the attorney." Advisory Committee Notes to Rule 26 (1993 Amendment).

[8] Plaintiff's counsel makes reference to the fact that he was "not involved in this cause for several months because of his departure as an associate from his former firm[.]" (Plaintiff's response, p. 4).  It is not clear whether he offers this as an excuse for non-disclosure or for failing to supplement.  However, plaintiff provided his initial disclosures and responses to interrogatories in September and October 2008, and plaintiff's present attorney was counsel of record in this action from December 18, 2008 until he withdrew on March 19, 2009; counsel presumably became familiar with the status of discovery in the case during that time, if not before then.  He did not again appear in this action until July 16, 2009, nearly two months after defendant filed its motion for summary judgment. See Docs. ## 13, 16, 17, 23.  The disclosure obligation also applied to plaintiff's previous

Significantly, in opposing the motion to strike, plaintiff has not argued or provided evidence that he was unaware: (1) at the time he made his initial disclosure in September 2008, that Edwards and/or Thomas likely had discoverable information subject to the disclosure requirement of Rule 26(a)(1)(A)(i); or (2) at the time he responded to defendant's interrogatories in October 2008, that Edwards and/or Thomas had knowledge of relevant facts concerning his claims. He also does not suggest that he learned belatedly, at some point shortly before he responded to the motion for summary judgment, that Edwards or Thomas had relevant testimony to offer. Additionally, Wright does not represent that he was unaware that his initial disclosures and discovery responses were incomplete or incorrect.

The record before the court demonstrates that plaintiff has filed declarations from previously undisclosed witnesses, and there is no evidence – or argument – from plaintiff that he was unaware either that Edwards and Thomas might provide testimony or that his previous disclosures were incomplete. Thus, the court concludes that plaintiff failed in either his initial obligation to disclose these witnesses or in his duty to supplement those disclosures to identify the witnesses in a timely manner as required by Fed. R. Civ. P. 26(a) and 26(e).[9]

*Has Plaintiff Established Substantial Justification or Harmlessness?*

"It is well-established that Fed. R. Civ. P. 37(c)(1), enacted in 1993, mandates that a

---

attorney, who withdrew from this action on May 27, 2009. Plaintiff may not avoid his Rule 26 obligation merely by reference to what his present attorney knew or didn't know.

[9] Plaintiff argues that the motion to strike is due to be denied because defendant failed to first comply with Rule 37(a) by filing a motion to compel. (Wright response to motion to strike, pp. 3-4). The court declines to hold that defendant should have sought an order compelling disclosure of information that it did not know had been withheld by plaintiff.

trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified."  Vance v. United States, 182 F.3d 920, 1999 WL 455435, *3 (6th Cir. 1999)(unpublished decision)(citation and footnote omitted). The rule "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion."  Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998)(footnote omitted).  Under Rule 37, the burden of establishing that non-disclosure is substantially justified or harmless is on the party who failed to disclose the information.  See Torres v. City of Los Angeles, 548 F.3d 1197, 1213 (9th Cir. 2008), cert. denied, 129 S.Ct. 1995 (2009); Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 20-21 (1st Cir. 2001)("[I]t is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction."); Finley v. Marathon Oil Company, 75 F.3d 1225, 1230 (7th Cir. 1996)("The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.").

"Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there exists a genuine dispute concerning compliance."  Nguyen v. IBP, Inc., 162 F.R.D. 675, 680 (D. Kan. 1995)(citing Pierce v. Underwood, 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).  Plaintiff has advanced no argument that his failure

to disclose was substantially justified, and has not satisfied his burden of establishing that it was.  Accordingly, absent an exercise of the court's discretion to impose a lesser sanction, plaintiff may avoid exclusion of the witnesses' testimony only if he demonstrates that the untimely disclosure was harmless.

Although plaintiff does not argue expressly that his failure to disclose was harmless, the court construes his response to include an argument that the failure was harmless because, when he disclosed the identity of the witnesses by filing their declarations, discovery was not closed and defendant could have then deposed the witnesses.  The Advisory Committee Note to the 1993 amendment to Rule 37(c) gives examples of "harmless" violations: "*e.g.*, the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party . . . ." Advisory Committee Notes, Rule 37(c)(1993 Amendments).  "This commentary strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." Vance, *supra*, 1999 WL 455435 at * 5.  Here, plaintiff has shown neither an honest mistake nor knowledge on the part of defendant that Edwards and Thomas were potential witnesses.  Additionally, since defendant prepared its summary judgment submission without knowledge of the identity of these two witnesses, the court cannot conclude that plaintiff's failure to comply with his disclosure obligation is harmless.  Accordingly, the motion to strike the declarations of Edwards and

Thomas will be granted.[10]

## DISCUSSION[11]

Under section 1981, it is unlawful for an employer to discriminate against an employee on the basis of his race with respect to the terms and conditions of his employment. 42 U.S.C. § 1981. Plaintiff claims that defendant discriminated against him by failing to select him for one of three available Team Leader positions in February or March 2006. The McDonnell Douglas/Burdine[12] framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination against an employer where, as here, there is no direct evidence of discrimination.[13] See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). This analytical framework also applies to race discrimination claims asserted pursuant to 42 U.S.C. § 1981. Standard v. A.B.E.L. Servs., Inc., 161 F.3d

---

[10] Defendant's objections to portions of these declarations (see Motion to Strike, pp. 6-11, 20-25) are almost entirely meritorious. Plaintiff's response reflects a misunderstanding of, *inter alia*, the problem presented by double hearsay. Accordingly, the court concludes, in the alternative, that the otherwise admissible portions of the declarations of Edwards and Thomas are not sufficient, even when viewed with the other admissible evidence of record, to establish pretext. Exclusion of the exhibits pursuant to Rule 37(c) as a discovery sanction is not, therefore, tantamount to dismissing plaintiff's claim. Plaintiff has not urged the court to impose an alternate sanction and the court concludes that the exclusion sanction set forth in Rule 37(c) is warranted in this case.

[11] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not made to the use or admissibility of the evidence waived for purposes of this motion. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).

[12] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

[13] Plaintiff does not argue that he has produced direct evidence of discrimination. See Wright's brief, pp. 19-32.

11

1318, 1330 (11th Cir.1998). The plaintiff must first make out a *prima facie* case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d at 1527-28. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting Burdine, 450 U.S. at 254); Walker, *supra*.

If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action." Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 257). If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed. Walker, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs, 106 F.3d at 1528.

For purposes of this summary judgment motion, HMMA concedes that the evidence satisfies plaintiff's burden of establishing a *prima facie* case of discrimination. (HMMA

brief, p. 18).   It contends that it is entitled to summary judgment on plaintiff's claim, however, because it has articulated a legitimate, non-discriminatory reason for not selecting Wright as a Team Leader, and Wright cannot establish pretext.  (Id., pp. 18-23).

HMMA hired plaintiff in June 2005 as a Production Team Member in the Welding department.[14]  (Wright depo., pp. 56-59 and Defendant's Exhibit 7 to Wright depo.).   In March 2006, HMMA posted a position announcement for Team Leader openings in its welding shop.   Three such positions were available.   Seven employees applied for the positions.   Two of the applicants, Wright and Ranzi Cowan, are African-American.   The remaining five applicants – Paul Dawson, Dawn Magruder, Stephen Stewart, Michael Swindle, and Jason Thornton – are Caucasian. HMMA selected Thornton, Swindle and Magruder for the Team Leader openings. (Kendrick declaration, ¶¶ 2, 4, 5, 15).   Defendant's Assistant Manager of Internal Staffing, James Kendrick explains the selection process for those positions as follows:

> Applicants for the positions were evaluated in an objective, four-part selection process, and the three candidates with the highest cumulative numerical scores at the end of that process were selected for the positions.
>
> The first step of the selection process was a written assessment, which called

---

[14]  HMMA refers to its production employees as "Team Members."  Team Members in plaintiff's area of the Welding Shop are supervised by a Group Leader; they also receive limited assistance and instruction from a "Team Leader."  A Team Leader's "primary purpose is to facilitate communication between the Group Leader and the Team Members; he or she also provides task-related guidance and instruction to Team Members on a day-to-day basis.  A Team Leader is an hourly, non-supervisory employee and is not considered a member of management; a Team Leader does not have the authority to hire, fire, discipline or promote employees or to authorize changes in a Team Member's pay.  A Team Member who becomes a Team Leader receives a pay increase of $1.00 per hour.  (Rose declaration, ¶¶ 5-8).

for the applicants to provide written answers to a standardized set of questions focused on five topics: (1) "Planning and Organizing Area Work Activity;" (2) "Controlling area output, quality, and cost;" (3) "Training/Developing Team Members;" (4) "Monitoring Team Member Performance;" (5) ["]Interfacing with other Team Leader/Managers."   . . .

The applicants' written assessments were graded by personnel in HMMA's Employment Department, using a standardized "answer key" to ensure uniformity of the grading process. Applicants were awarded points for each of the five subject areas of the test, based on how closely their answers matched the information provided in the answer key and how well the applicant explained his answer. The applicants' scores on the five subject areas were then added to determine their respective scores on the written assessment portion of the selection process.

Candidates were then interviewed by two-person interviewing panels. Each panel included a member of the Welding Shop's management and a representative of the Employment Department. The members of the interview panels used a prepared interview guide, to ensure that all applicants were asked questions on eight different topics: (1) work standards; (2) training; (3) job motivation; (4) initiative; (5) safety; (6) leadership; (7) dealing with management; and (8) communication. At the conclusion of each interview session, the panel members jointly assigned a consensus score, on a scale of from 1 to 5, for each of the eight subject areas of the interview. Those eight consensus scores were then added to determine the applicant's overall score on the interview portion of the selection process.

*   *   *   *   *

The third element of the selection process is the Peer Review system. The applicants' fellow Team Members were given the opportunity to indicate on a peer review form whether they did or did not recommend the respective applicants to serve as Team Leaders. Those forms were then turned in to the Employment Department for tabulation. Because not every Team Memter provided an answer as to every applicant, an applicant's Peer Review score was calculated by determining the percentage of peer reviewers who recommended the applicant out of the total number of peer reviewers who provided a response about the applicant (regardless of whether the response was positive or negative). That percentage was then multiplied by 20, which was the total number of points possible for the peer review process, to determine the applicant's peer review score. For example, if an applicant had

received 5 "yes" responses and 5 "no" responses on the peer review forms, his percentage of "yes" responses would have been 50%, and 50% of the 20 total possible points would have been 10 points.  Thus, his Peer Review score would have been 10.

Finally, members of the Welding Shop's management team provided numerical rankings of the applicants on a scale of 1 to 5, based on their prior performance in each of 11 separate areas: (1) ability to perform manufacturing work; (2) safety; (3) quality; (4) productivity; (5) attendance; (6) ability to work well with others; (7) verbal communications; (8) written communications; (9) housekeeping; (10) timeliness; and (11) ability of the applicant to perform tasks independently of direct supervision. The management review form then asked the reviewer to state whether he or she recommended each applicant.  If the manager responded that the applicant was recommended, an extra 5 points was added to the applicant's score.  If the manager responded that the applicant was not recommended, 1 point was added to the applicant's score. . . .

Personnel in HMMA's Employment Department calculated an applicant's overall score on the management review stage of the process by first calculating the average of the scores that the different managers had assigned to the applicant.  Then, a percentage score was calculated by dividing the applicant's average by 60, which was the total number of points possible on the review form.  That percentage was then multiplied by 40, which was the total number of points possible for the management review process, to determine the applicant's overall score for the management review process.

Personnel in HMMA's Employment Department calculated the applicants' cumulative scores by adding the scores that the applicants had attained in each of the four parts of the selection process. . . .

The three applicants with the highest cumulative scores were selected for promotion to the three Team Leader positions.

(Kendrick dec., ¶¶ 6-9, 11-15).

Plaintiff does not contend that defendant has not met its burden of articulating a

legitimate reason for its Team Leader selection decision.[15]  Rather, plaintiff argues only that

he has established a *prima facie* case of discrimination (as defendant concedes for purposes

of this motion) and that the reason articulated by defendant for selecting Thornton, Swindle

and Magruder for the three available positions is pretextual.  (See Plaintiff's brief, p. 22).

Plaintiff argues that he "has presented substantial evidence regarding HMMA's management

to establish that the 'objective, four-part test' was administered in a *subjective* and *racially*

*discriminatory* manner." (Wright's brief, p. 24)(emphasis in original).  Defendant's selection

process is not, of course, purely objective.  However, as plaintiff apparently recognizes, it

is not enough to show that the promotion process incorporated subjective elements.   A

plaintiff may, as plaintiff argues, establish pretext by producing evidence that reveals "'such

weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [defendant's]

proffered legitimate reasons for its actions that a reasonable factfinder could find them

unworthy of credence.'" Springer v. Convergys Customer Management Group, Inc., 509 F.3d

1344, 1348 - 1349 (11th Cir. 2007)(quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th

Cir. 2004)).  "However, a reason is not pretext for discrimination 'unless it is shown *both* that

the reason was false, *and* that discrimination was the real reason.'" Id. (citing Brooks v.

County Comm'n of Jefferson County, 446 F.3d 1160, 1163 (11th Cir.2006)(emphasis in

---

[15]  Due to the manner in which HMMA made the selections at issue – with the four-stage
Team Leader applicant scoring process being managed by HMMA's Employment Department –
defendant's introduction of the declaration of its Assistant Manager of Internal Staffing is sufficient
to meet HMMA's burden of articulating its reason for selecting Thorton, Swindle and Magruder.

original).[16]  Plaintiff's arguments that he has established pretext are as follows:

(1) Michael Swindle, one of the three selectees, bore racial animus toward African-Americans. Because Group Leader Culpepper, Assistant Manager White and Manager Bondy permitted Swindle "to act in the capacity of a 'de facto' manager," Swindle is a decision-maker. Under the "cat's paw" theory, Swindle was the "true decision maker" and, even "[a]ssuming for the limited purpose of this argument that Plaintiff lacked substantial evidence of discriminatory animus by Culpepper, White, and Bondy, these individuals would be mere conduits for Swindle's discriminatory animus."  (Wright's brief, pp. 24-25).

(2)  Culpepper, White and Bondy, managers who participated in the selection decision, also bear racial animus against African-Americans. Accordingly, HMMA's articulated reason is pretextual because: (a) plaintiff's application was the only application that did not bear the approval signature of his Group Leader, Culpepper;[17] (b) plaintiff and

---

[16]  In some cases, proof that an employer's asserted justification is false, when coupled with the evidence establishing the plaintiff's *prima facie* case, is sufficient to permit an inference of discrimination.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).  To the extent plaintiff suggests that this is always sufficient (see Wright brief, p. 19), he is wrong. Reeves, 530 U.S. at 148 ("This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.")(emphasis in original).

[17]  Plaintiff argues that his was the only application that did not bear a Group Leader signature (Wright's brief, pp. 26-27).  However, the evidence he cites on this point (id. at pp. 5-6) includes only the applications of the selectees and plaintiff, and not those of the remaining three applicants.  (Plaintiff's Exhibit 4).  Plaintiff points to no evidence suggesting that the lack of a supervisor's signature on the application affected the Team Leader selection in any way, and the evidence he has provided is insufficient to permit an inference that plaintiff (or anyone else) ever presented plaintiff's application to Culpepper for signature and that Culpepper refused to sign it.

the other African-American applicant ranked second and third, respectively, on the written test, the only truly objective measure used in scoring applicants; (c) White sat on three other interview panels and, also, on plaintiff's; (d) the interviewers were permitted to select one question of three on each page of the interview guide and they did not ask all applicants exactly the same questions; (e) plaintiff was ranked sixth of seven in the interview portion, even though the selectees had no notes written in three to five sections of the interview panel's evaluation forms, while plaintiff had notes written by the interviewers in all but one section of the form; (f) plaintiff is more qualified than the selectees by virtue of his educational background and employment experience; (g) the scores reported by HMMA for the peer review process do not match the scores calculated by reference to the peer review forms produced by defendant in discovery, HMMA produced only 90 of 220 peer review forms to plaintiff during discovery, and 85% of the produced forms are missing "required information such as each responding Team Member's Group Leader and Assistant Manager"; (h) the participation of Culpepper, White and Bondy, individuals bearing racial animus, in the management review process "annihilates" its objectiveness, and their collusion to promote whites as Team Leaders is evidenced by a statistical analysis of the management review forms, which demonstrate a pattern which is "extremely improbable" for five independent evaluations.[18]  (Wright's brief, p. 25-30).

_____

(See Wright's brief, pp. 5-6).

[18]  Plaintiff contends that none of the managers recommended plaintiff or Cowan, the other African-American applicant, for selection, and "all of the other applicants . . . being Caucasian Team Members, received recommendations for such promotion." (Wright's brief, pp. 28-29). The division

The problem with plaintiff's "cat's paw" argument is that plaintiff has produced no evidence that Swindle – except to the extent that he also applied and interviewed for the position – influenced the particular Team Leader selection decision at issue in this case. Plaintiff has not shown that Swindle provided input to the managers conducting the management reviews, to anyone conducting interviews, or even to anyone completing peer reviews.[19] Even accepting as true the excluded evidence from the Edwards declaration that Swindle harbors discriminatory animus, and also accepting as true plaintiff's testimony that Swindle "ordered and/or directed other Team Members as if he were a member of management," and that "[s]uch orders and/or directions were given at the behest [of] and in the presence of the managers, i.e., White and/or Bondy[,]" plaintiff still has not presented evidence sufficient to establish pretext under a "cat's paw" theory.[20]  See Hyde v. K.B.

---

is not as neat as plaintiff indicates; none of the five managers recommended Stephen Stewart, a Caucasian, for selection.  (See Plaintiff's Exhibit 9 and Kendrick dec. at ¶ 4).  Plaintiff also points to evidence of the "striking similarities" between the evaluations of plaintiff and Cowan (Cowan receiving a rating of "3," or "Satisfactory," in all 55 ratings; plaintiff receiving a "3" in 45 of 55) and between the selectees (only seven percent of Thornton's and Magruder's ratings are different and only nine percent of Dawson's and Swindle's ratings are different); the similarity of all five managers' ratings of Swindle (all five managers giving the same rating in 8 of 11 categories, with only one errant rating in each of the remaining three categories; and with all resulting in a final score of "50").

[19]  Swindle could have completed a peer review form. Plaintiff has not introduced any evidence that Swindle did so, however.  Even if he had introduced such evidence, the influence on HMMA's selection process from a single peer review form would not suffice to establish a racially discriminatory selection under the "cat's paw" theory.

[20]  See Wright declaration, ¶ 6. As defendant argues in its Motion to Strike (see p. 12), plaintiff's testimony that Swindle ordered and directed other Team Members "at the behest [of] . . . managers, i.e., White and/or Bondy" is conclusory. The introductory paragraph of plaintiff's declaration, in which he asserts his competence "to make this declaration based upon [his] personal knowledge[,]" is not a sufficient substitute for providing specific facts, within plaintiff's knowledge,

Home, Inc., 355 Fed. Appx. 266, 273 (11th Cir. 2009)("Hyde cannot establish a 'cat's paw' theory of retaliatory discharge because she has not presented evidence that any of the actual decision makers had any substantial input from Waibel in making their decision."); Hanford v. Geo Group, Inc., 345 Fed. Appx. 399 (11th Cir. 2009)(a plaintiff may prove causation under a "cat's paw" theory by showing that "the decisionmaker followed an illegally-biased recommendation without 'independently investigating' the reasoning behind it")(citation omitted).  Thus, plaintiff has failed to produce evidence sufficient to establish pretext on the basis of Swindle's racial animus and the cat's paw theory.

Plaintiff argues that Culpepper, White and Bondy also harbor racial animus. However, plaintiff has produced no evidence sufficient to permit an inference that this is so.[21]

---

to support his conclusion that Swindle acted "at the behest [of]" White or Bondy.  However, even if plaintiff's conclusion is correct, and Swindle ordered and directed team members at the behest of White and Bondy, this fact does not establish that Swindle influenced the Team Leader selection process.

[21]  Plaintiff testifies that he did not commit the conduct for which he was disciplined in October 2006 – i.e., the toy snake incident. (Wright depo., pp. 124-25; Wright dec., ¶ 14). However, he has offered no evidence – either admissible or inadmissible – that Culpepper, Bondy, or any of the other HMMA employees who signed the serious misconduct letter (Exhibit 16 to Wright depo.) did not believe that plaintiff committed the alleged misconduct.  Plaintiff's argument that Culpepper harbors a discriminatory bias against African-Americans rests on the Serious Misconduct letter and the excluded testimony of Edwards and Thomas.  (Wright's brief, pp. 14-15, 25-26). In his statement of facts, plaintiff cites evidence that Culpepper issued a counseling letter (a "discussion planner") to plaintiff for leaving his assigned work area that was unwarranted because plaintiff "reasonably understood" that his Team Leader, Ulrich, had authorized plaintiff to exercise his "reasonable discretion" in moving between the "door line" and the "roof line" and that plaintiff did so in the exercise of his "reasonable judgment." (Wright's brief, pp. 3-5). Plaintiff has not expressly argued that this evidence demonstrates racial bias on Culpepper's part (see id., pp. 14-15, 25-26), but the court has considered it in resolving the present motion. Plaintiff's argument that White harbors racial animus rests on plaintiff's testimony (Wright dec. at ¶ 6) that "Swindle ordered and/or directed other Team Members as if he were a member of management . . . at the behest and in the presence of the managers, i.e., White and Bondy"; the excluded testimony of Edwards,

Additionally, he has produced no evidence that the ratings by the managers in the management review segment of the selection are not statistically probable in the absence of collusion, and the ratings themselves do not permit a reasonable inference of statistical improbability.  Of the remaining evidence cited by plaintiff to demonstrate pretext (see pp. 17-18, ¶¶ 2(a)-2(g)), the only evidence meriting discussion is that regarding plaintiff's superior qualifications and the evidence regarding the peer review forms.

Plaintiff contends that he is more qualified for a Team Leader position than the selectees, by virtue of his education and previous work experience.

> In the context of a promotion, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact

including her testimony regarding Swindle's racist statements; and the excluded testimony of Thomas. (Wright brief, pp. 15-16, 26).  Plaintiff's argument that Bondy is biased against African-Americans rests on the evidence plaintiff cites as to White and, also, his own testimony: (1) that Stacy Jones, a Human Resources employee, told him that "according to Bondy, [plaintiff] would never be allowed to work in Team Relations" and (2) that Anthony Johnson, a recruiter in the Human Resources office, told plaintiff in June 2006 that the reason plaintiff did not get a maintenance specialist position was because his "test scores were not high enough" when, in fact, plaintiff "was never given the opportunity to take a test for this position."  (See Wright dec., ¶¶ 11, 12; Wright's brief, pp. 15, 26).  As defendant argues in its motion to strike, plaintiff's testimony about what Jones told him about what Bondy said is hearsay, not admissible on the present motion. Defendant's hearsay objection is without merit as to Johnson's statement – plaintiff does not offer the statement to prove that his "test scores were not high enough" – but this evidence does not in any way suggest that Bondy harbors racial animus. The court has considered plaintiff's testimony regarding what he believes to be evidence of other instances of discriminatory conduct (Wright dec., ¶¶ 7-10). Plaintiff's declaration does not demonstrate that he has personal knowledge of what Culpepper, White, or Bondy knew about any of these incidents; indeed, it does not provide sufficient information to permit any conclusion about the extent of each of these managers' involvement with the described incidents.  The evidence remaining under consideration on the present motion is not sufficient to permit an inference of racial bias on the part of Culpepper. Further, the evidence of record – even including the excluded testimony of Edwards and Thomas – is not sufficient to permit an inference of racial bias on the part of either Bondy or White.

motivated by race." [Brooks v. County Comm'n of Jefferson County, 443 F.3d 1160, 1163 (11th Cir. 2006)](citing Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir.2000)). Furthermore, a plaintiff must show that the disparities between the successful applicant's and his own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Cooper [v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004)] (citation omitted); see also Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S. Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006) (approving of this language from Cooper).

Springer v. Convergys Customer Management Group Inc., 509 F.3d 1344, 1348-1349 (11th Cir. 2007). Plaintiff argues that "a cursory review of each applicant's educational background and employment experience unequivocally establishes that Plaintiff was more qualified than either Swindle, Magruder or Thornton." (Wright's brief, pp. 27-28). The job posting for the Team Leader vacancies, under a section with the header "Education and Experience Necessary," indicates that a high school diploma or its equivalent and software skills in Word, Powerpoint, Excel, and Outlook are required, and that an "Associates or Bachelors degree or some college" is "preferred." (Plaintiff's Exhibit 3). Plaintiff has more college than any of the selectees. His application indicates that he has a Bachelor of Science degree in Management, Marketing and Research, a second Bachelor of Science degree in Resource Management, and an Associate of Science degree in "General Education (Military Science)." (See Plaintiff's Exhibit 4). Magruder has a nursing degree from Central Alabama Community College, Thornton has an Associate's degree in Drafting and Design Technology from Bevill State Community College, and Swindle has vocational school training in auto body repair. (Plaintiff's Exhibit 4). Swindle had the longest tenure in his group at HMMA, at twenty-six

months.  Magruder had nearly fifteen months in the group and Thornton and plaintiff each had nine months.  (Id.).  Plaintiff had previous experience as an Air Force NCO (E-5), and ten years as manager of "TKO Productions & Promotions." (Plaintiff's Exhibits 4, 5).[22] Magruder had ten years of military experience in the Navy and the National Guard; Swindle's and Thornton's Team Leader applications and interview notes do not list any work experience before HMMA.  (Plaintiff's Exhibit 4, 6, 7, 8).  As noted previously, a Team Leader is a hourly, non-supervisory employee and is not considered a member of management; the Team Leader's primary responsibilities include providing task-based instruction to Team Members and facilitating communication between the Team Members and the Group Leader.  (Rose dec., ¶ 7).  It is not at all apparent that plaintiff's additional education and work experience render him more qualified to perform the particular job functions required of a Team Leader; plaintiff's evidence falls far short of that necessary to permit an inference that "no reasonable person, in the exercise of impartial judgment, could have chosen [Magruder, Swindle or Thorton] over the plaintiff." (See Springer, 509 F.3d at 1348-49). Thus, plaintiff's educational credentials and his previous work experience are not sufficient to establish pretext.

Peer recommendation scores, according to HMMA, comprised a portion of the overall

---

[22]  Plaintiff raises his qualification argument in the context of the interview portion of the selection process. (See Wright's brief, p. 8). He argues that he had fourteen years of military experience. While the length of plaintiff's Air Force service is evidenced in plaintiff's initial application for employment at HMMA (see Plaintiff's Exhibit 2), neither plaintiff's application for the team leader position nor the interview notes indicate the length of time plaintiff spent in the military.  (See Plaintiff's Exhibits 4, 5).

scores used to select the Team Leaders.  (Kendrick dec., ¶¶ 11, 14).  Plaintiff argues that "allowing the participation of racially biased individuals such as Culpepper, White and Bondy" causes the peer review process to "lose[] its objectiveness, not because of the test's design, but rather because of the administration thereof."  (Wright's brief, p. 28).  Plaintiff suggests that this tainting of the process by Culpepper's, White's and Bondy's racial animus is evidenced by the following: (1)  the scores reported by HMMA for the peer review process do not match the scores calculated by reference to the peer review forms produced by defendant in discovery, (2) HMMA produced only 90 of 220 peer review forms to plaintiff during discovery; and (3) 85% of the produced forms are missing "required information such as each responding Team Member's Group Leader and Assistant Manager." (Wright's brief, pp. 9-10, 28).  As discussed previously, plaintiff's evidence is insufficient to permit an inference of racial bias on the part of Culpepper, White or Bondy.  Additionally, as defendant argues, plaintiff points to no evidence suggesting that Culpepper, White or Bondy were involved in collecting or tabulating the peer review forms. (Defendant's brief, p. 25). Plaintiff notes that approximately 220 employees work in the welding shop, including both shifts, and that his own Peer Review evaluation form is missing from the ninety forms produced by HMMA during discovery.  He states that he is "of the opinion that Peer Review forms from only one shift were produced and/or provided." (Wright dec., ¶¶ 15-16). Defendant contends that plaintiff's assumption is unfounded.  (Defendant's brief, p. 25-26). An opinion offered in opposition to summary judgment is conclusory, unless it is supported by specific underlying facts, see Pace v. Capobianco, 283 F.3d 1275, 1280 (11th Cir. 2002),

and conclusory statements in an affidavit or declaration are insufficient to overcome a properly supported motion for summary judgment.[23]  Plaintiff testifies as to some underlying facts – *i.e.*, that there are approximately 220 employees in the welding shop, counting both shifts, and that plaintiff's own peer review form is missing from the ninety forms provided in discovery – but these facts are insufficient, even in light of the differing percentages of favorable recommendations calculated by plaintiff's counsel for the ninety forms,[24] to support his conclusion that defendant produced the peer review forms from only one of the two shifts.  The fact that plaintiff's own form is missing – while it is evidence that not every peer review form that was completed was produced during discovery[25] – is insufficient, without more evidence than plaintiff has offered on the present motion, to demonstrate manipulation of the peer review process by Culpepper, White or Bondy.[26]

---

[23]  The Eleventh Circuit has "'consistently held that conclusory allegations without specific supporting facts have no probative value.'" <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1217 (11th Cir. 2000)(quoting <u>Evers v. General Motors Corp.</u>, 770 F.2d 984, 985 (11th Cir. 1985));  <u>see also</u> <u>Miller v. Citizens Security Group, Inc.</u>, 116 F.3d 343, 346 (8th Cir. 1997)("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment.").

[24]  The calculations by plaintiff's counsel result in downward adjustments of five of the applicants' scores, including plaintiff's, no adjustment to Stewart's score, and an upward adjustment to Thornton's scores. (<u>See</u> Wright's brief, p. 28.) As defendant observes, however, these adjustments do not result in any change in the relative ranking of the applicants.

[25]  Plaintiff did not move to compel production of additional peer review forms.

[26]  Plaintiff does not argue that he has demonstrated pretext by producing evidence that: (1) his own form is missing from those produced in discovery; (2) 220 people work in the welding shop; (3) only 90 forms were provided to his attorney in discovery; (4) and contrary to the instructions on the form that it "must be completed and returned to Employment & Benefits within 24 hours," only fifteen of the 90 forms have Group Leader or Manager names in the space provided for such names.  Rather, he argues that this evidence, when considered in light of the evidence of

Accordingly, the court concludes, upon consideration of the evidence allowed and admissible on the present motion, that plaintiff has not demonstrated the existence of a genuine issue of material fact as to pretext, and that defendant's motion for summary judgment is due to be granted.

## CONCLUSION

For the foregoing reasons, and for good cause, it is ORDERED that:

(1) defendant's notice of filing erroneously omitted exhibits (Doc. # 43), previously construed as a motion for leave to supplement defendant's evidentiary submission (see Order, Doc. # 44), is DENIED;[27]

(2) defendant's motion to strike (Doc. # 30) is GRANTED to the extent set forth in this Memorandum Opinion; and

(3) defendant's motion for summary judgment (Doc. # 18) is GRANTED.

A separate judgment will be entered.

Done, this 16th day of November, 2010.

---

racial bias on the part of Culpepper, White and Bondy, establishes pretext.  (See Wright declaration, ¶¶ 15-17; Plaintiff's Exhibit 13; Wright brief, p. 28; Wright's response to motion to strike, p. 9).  The court concludes that, without evidence sufficient to establish racial bias by these three managers or evidence of the extent of their involvement in the peer review process, the remaining evidence cited by plaintiff does not establish pretext.

[27]  Some of the exhibits attached to the motion to supplement were already in evidence, as they were exhibits to plaintiff's deposition and were filed with defendant's motion for summary judgment, or they were filed by plaintiff in opposition to the motion.  The court did not consider those supplemental exhibits which were not filed previously with the motion or plaintiff's response (Exhibits A-D to Rose dec.).

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE